NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
VICTOR A. RODGERS
California Bar No. 101281
Assistant United States Attorney
Asset Forfeiture Section
     Federal Courthouse, 14th Floor
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2569
     Facsimile: (213) 894-0142
     E-mail: Victor.Rodgers@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:20-CV-07844 |
| Plaintiff, | COMPLAINT FOR FORFEITURE |
| v. | 18 U.S.C. §§ 981(a)(1)(A) and (C) and 984 |
| $865,894.54 SEIZED FROM THREE BANK AND CREDIT UNION ACCOUNTS, THE BALANCES ON APPROXIMATELY THIRTEEN CALIFORNIA EMPLOYMENT DEVELOPMENT DEPARTMENT BENEFIT/DEBIT CARDS AND $11,679.00 IN U.S. CURRENCY, | [HSI] |
| Defendants. | |

     Plaintiff United States of America brings this claim against defendants $865,894.54 Seized From Three Bank And Credit Union Accounts, The Balances On Approximately Thirteen California Employment Development Department Benefit/Debit Cards

and $11,679.00 In U.S. Currency (collectively, the "defendants"), and alleges as follows:

## JURISDICTION AND VENUE

1. The government brings this in rem forfeiture action pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) and 984.

2. This Court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C. § 1395.

## PERSONS AND ENTITIES

4. The plaintiff in this action is the United States of America.

5. The defendants in this action are:

    i. $865,894.54 Seized From Three Bank And Credit Union Accounts (the "defendant bank funds") seized on or about July 8, 2020 pursuant to federal seizure warrants and is comprised of (a) $735,159.29 seized at Bank of the West, 496 Long Beach Boulevard, Long Beach, California from an account in the name of Arman Manukyan dba MA&CO and with the last four digits ending in 1040; (b) $109,880.94 seized at Bank of America, 3804 Atlantic Avenue, Long Beach, California from an account in the name of Arman Manukyan and with the last four digits ending in 4800; and (c) $20,854.31 seized at Los Angeles Federal Credit Union, P.O. Box 53032, Los Angeles, California from an account in the name of Arman Manukyan and with the last four digits ending in 7320;

    ii. The Balances On Approximately Thirteen California Employment Development Department Benefit/Debit Cards (the "defendant EDD Funds"), which Benefit/Debit Cards were seized on or about July 22, 2020 during the execution of a federal search warrant at Manukyan's Panorama City, California residence and contain a total balance of approximately $115,474.25;[1] and

    iii. $11,679.00 In U.S. Currency (the "defendant currency") seized on or about July 22, 2020, during the execution of a federal search warrant at Manukyan's Panorama City, California residence.

  6. The defendants are currently in the custody of the United States Customs and Border Protection, Department of Homeland Security in this District, where they will remain subject to this Court's jurisdiction during the pendency of this action.

  7. The interests of Arman Manukyan (as to all the defendants), Bank of America (as to the defendant bank funds) and the California Employment and Development Department (as to the defendant EDD funds) may be adversely affected by these proceedings.

/ / /

---

[1] The last four digits, initials and approximate individual balances on the thirteen benefit/debit card numbers are as follows: (1) 5189, A.I., $1,341.06; (2) 0243, E.R., $7,600.00; (3) 6997, J.T., $10,600.00; (4) 1691, A.K., $11,700.00; (5) 5737, D.Y., $7,600.00; (6) 5437, D.M., $9,600.00; (7) 6426, T.M., $3,500.00; (8) 9500, Y.V., $11,700.00; (9) 4285, O.P., $16,700.00; (10) 7480, P.F., $16,700.00; (11) 5449, A.M., $2,037.19; (12) 7762, J.B., $9,696.00; and (13) 7111, V.F., $6,700.00.

## BASIS FOR FORFEITURE

### Manukyan's Fraud Schemes

8. In or about June 2020, Arman Manukyan ("Manukyan") submitted two loan applications, seeking a total loan of $1.7 million, to Bank of America ("BofA") on behalf of two shell entities registered to Manukyan - - Argo Global, Inc., and Express Wiring - - through the Paycheck Protection Program established by the Coronavirus Aid, Relief, and Economic Security Act. BofA approved the Argo Global, Inc. loan and denied the Express Wiring loan request. As a result of the loan approval, Manukyan received a total of $867,187.00 in Paycheck Protection Program loan proceeds. With respect to the loan application process, Manukyan submitted fabricated tax documentation, and made false representations about the shell entity companies' operational status and how those companies would spend the Paycheck Protection Program loan proceeds.

9. Shortly after Manukyan received the $867,167.00 in Paycheck Protection Program funds in a bank account at BofA in Argo Global Inc.'s name, Manukyan withdrew the funds from that account by transferring via wire transfer and check deposits over $730,000.00 into Manukyan's Bank of the West account in his name (and from which the government seized $735,159.29 of the defendant $865,894.54 in bank funds), transferring via wire $110,000.00 into Manukyan's BofA account in his name (and from which the government seized $109,880.40) and cashing checks totaling $24,300.00 and drawn on the BofA account in Argo Global, Inc.'s name at Los Angeles Federal Credit Union (the financial institution where Manukyan held an account in his name

and from which the government seized $20,854.00). As a result, the government has seized $865,894.54 ($735,159.29 + $109,880.40 + $20,854.00) out of the $867,187.00 in proceeds Manukyan derived from his fraud scheme.

10. Manukyan has also engaged in a fraud scheme whereby Manukyan used the identity of others to apply for and obtain California Employment Development Department benefit/debit cards, which debit cards Manukyan used at bank ATMs to withdraw in cash unemployment benefits. The proceeds of Manukyan's unemployment benefit fraud scheme are the defendant EDD funds and the defendant currency.

11. Manukyan has fled the jurisdiction. A criminal complaint was filed against Manukyan on or about August 10, 2020.

Description Of The Paycheck Protection Program

12. The Coronavirus Aid, Relief, and Economic Security Act, which is also known as the CARES Act, is a federal law enacted around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). Around April 2020, Congress authorized over $300 billion in additional PPP funding.

13. In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an

authorized representative of the business.  The PPP loan application requires the business, through its authorized representative, to acknowledge the Program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  One such certification requires the applicant, through its authorized representative, to affirm that:

> [t]he [PPP loan] funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments; I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges.

14.  In addition, the business, through its authorized representative, must state, among other things, the company's number of employees and average monthly payroll expenses, and provide documentation showing the company's payroll expenses. The employee and payroll expense numbers are used to calculate the amount of money the business is eligible to receive under the PPP.

15.  In the first instance, the company's PPP loan application is received and processed by a participating financial institution, and then the application is transmitted to the Small Business Administration ("SBA") for further review and assessment of the applicant's eligibility.  If a PPP loan application is approved, the participating financial institution funds the PPP loan using the financial institution's own monies.

16.  PPP loan proceeds must be used by the business on certain permissible expenses, namely payroll costs, interest on

mortgages, rent and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time (usually eight weeks of receiving the proceeds) and uses at least 75% of the PPP loan proceeds on payroll expenses.

Manukyan's Submission Of Loan Applications Seeking PPP Loans For His Shell Companies Argo Global, Inc. And Express Wiring

17. In or around June 2020, Manukyan submitted, on behalf of his shell companies Argo Global, Inc. and Express Wiring, two applications for PPP loans to BofA, which as a result of the submission were received by the SBA. As mentioned above, Manukyan submitted the loans on behalf of two shell entities registered to Manukyan, namely Argo Global, Inc. and Express Wiring. Manukyan's loan applications contained the information set forth below.

18. First, Manukyan applied for a loan in the name of Argo Global, Inc. The application listed Manukyan as Argo Global, Inc.'s principal and falsely claimed that Argo Global, Inc. was a sewing business with an average monthly payroll expense of $346,875.00 and 73 employees. In addition, the application provided that Manukyan had a home address in Glendale, California. However, Manukyan's immigration file reflects that Manukyan told immigration authorities that Manukyan's ex-wife and son, and not Manukyan, lived at that address.

19. Also, Manukyan's loan application identified Argo Global, Inc.'s address as 433 N. Camden Drive 6th floor, Beverly Hills, California. However, 433 N. Camden Drive actually

belonged to a company that leased virtual office space to tenants. Later in June, on June 30, 2020, law enforcement officers spoke with 433 N. Camden Drive's landlord from whom Argo Global, Inc. had leased space at that location, and learned the following. Argo Global, Inc. had never conducted any actual business operations at 433 N. Camden Drive. In fact, Argo Global, Inc. never had an actual office at 433 N. Camden Drive nor any employees who worked at that location. Instead, Argo Global, Inc. only had a virtual office at 433 N. Camden Drive, and the only service the landlord performed for Argo Global, Inc. was holding the company's mail.

20. In addition, Manukyan's underwriting packet did not include a list of employees or associates employed by Argo Global, Inc. Moreover, Manukyan provided, as part of the loan application and as proof of Argo Global, Inc.'s payroll expenses, an unsigned Internal Revenue Service ("IRS") Form 940-Employer's Annual Federal Unemployment (FUTA) dated April 8, 2020 and an unsigned IRS Form 941-Employer's Quarterly Federal Tax dated January 12, 2020, purporting to show $4,162,500 in wages and payroll taxes for Argo Global, Inc. for tax year 2019. However, law enforcement officers have learned that the tax documents Manukyan submitted for the PPP loan were a fabrication because no tax documents have ever been filed by Argo Global, Inc. with the IRS.

21. The SBA requires applicants for PPP loans to make certain certifications and representations with respect to their PPP loan applications. Manukyan certified in his Argo Global, Inc. loan application that Argo Global, Inc. "had employees for

1  whom the applicant paid salaries and payroll taxes or paid
2  independent contractors;" that "[a]ll SBA loan proceeds will be
3  used only for business-related purposes as specified in the loan
4  application and consistent with the Paycheck Protection Program
5  Rule;" and that "the funds will be used to retain workers and
6  maintain payroll or make mortgage interest payments, lease
7  payments, and utility payments."  These certifications were
8  false.
9      22.  Second, Manukyan also applied for a loan, seeking
10 $884,748.00 in PPP funds, in the name of Express Wiring.  In the
11 application, Manukyan listed himself as Express Wiring's
12 principal and the above-referenced Glendale, California address
13 as the loan mailing address.  This PPP loan application was sent
14 to BofA a few days after the Argo Global, Inc. application.  The
15 SBA rejected Manukyan's Express Wiring application, indicating
16 that the application had been submitted either after the cutoff
17 date of June 22, 2020 or the government allocated funds for the
18 PPP had run out.
19     23.  Both Argo Global, Inc. and Express Wiring are shell
20 companies.  As to Argo Global, Inc., searches conducted on open
21 source search engines, such as Google, and business networking
22 applications, such as Yelp, do not reflect any information
23 related to any sewing business matching the identifiers provided
24 by Manukyan.
25     24.  Likewise, searches conducted relative to the same
26 databases did not result in the location of any information
27 related to a business named Express Wiring matching the
28 identifiers provided by Manukyan.  In addition, and as mentioned

above, Manukyan submitted IRS Forms 940 and 941 with his PPP loan application for Argo Global, Inc. to reflect the company's authenticity, but no tax documents have ever been filed with the IRS for Argo Global, Inc., or for Manukyan's other shell company Express Wiring.

<u>BofA Funds The Loan By Transmitting Funds Into Shell Company Argo Global, Inc.'s Bank Account, Which Funds Manukyan Thereafter Transferred To His Personal Accounts</u>

25. On or about June 3, 2020, BofA funded the Argo Global, Inc. PPP loan by wiring $867,187.00 in approved PPP loan funds to an account at BofA with the last four digits ending in 5294 (the "Argo Global, Inc. BofA 5294 Account"), which account is in the name of Argo Global, Inc., was opened at a BofA branch on or about January 28, 2020 and is an account for which Manukyan has the sole signature authority.

26. Almost immediately after the June 3, 2020 deposit of the $867,187.00 in PPP funds into the Argo Global, Inc. BofA 5294 Account, Manukyan began transferring those funds out of that account and into personal bank accounts in his name. On June 4 and 5, 2020, Manukyan transferred a total of $110,000.00 from the Argo Global, Inc. 5294 Account to a BofA account with the last four digits ending in 4800 (the "Manukyan BofA 4800 Account"), consisting of a $48,000.00 transfer on June 4, 2020 and a $62,000 transfer on June 5, 2020. Manukyan opened the Manukyan BofA 4800 Account at a BofA branch on or about August 28, 2017 and, as reflected in paragraph 5 above, the government seized $109,880.94 from that account pursuant to a federal seizure warrant on July 8, 2020.

27. Similarly, Manukyan quickly transferred the PPP funds from the Argo Global, Inc. BofA 5294 Account into an account at Bank of The West with the last four digits ending in 1949 (the "Manukyan BoTW 1949 Account"), which is another one of Manukyan's personal accounts. The Manukyan BoTW 1949 Account is in the name of Arman Manukyan dba MA&CO and was opened at a Bank of the West ("BoTW") branch on or about May 22, 2018. During June 2020, Manukyan transferred a total of $731,900.00 from the Argo Global, Inc. BofA 5294 Account to the Manukyan BoTW 1949 Account, consisting of $687,000.00 in wire transfers ($475,000.00 on June 17, 2020 and $212,000.00 on June 18, 2020) and $44,900.00 in checks drawn on the Argo Global, Inc. BofA 5294 Account and deposited during June 2020 into the Manukyan BoTW 1949 Account. As reflected in paragraph 5 above, the government seized $735,159.29 from the Manukyan BoTW 1949 Account pursuant to a federal seizure warrant on July 8, 2020.

28. In addition, Manukyan used a Los Angeles Federal Credit Union account in his name and with the last four digits ending in 7320 (the "Manukyan LAFCU 7320 Account") to negotiate checks drawn on the Argo Global, Inc. BofA 5294 Account. These checks were payable to Manukyan and represented proceeds of Manukyan's PPP fraud scheme. As mentioned above, BofA deposited $867,187.00 in PPP funds into the Argo Global, Inc. BofA 5294 Account on or about June 3, 2020. A few days later, Manukyan withdrew from that account $24,300.00, consisting of $9,600.00 and $14,700.00 withdrawn on June 5 and 11, 2020, respectively, by presenting for payment at Los Angeles Federal Credit Union the checks totaling $24,300.00 that were payable to Manukyan.

As reflected in paragraph 5 above, the government seized $20,854.31 from the Manukyan LAFCU 7320 Account pursuant to a federal seizure warrant on July 8, 2020.

### Manukyan's June 24 and 26, 2020 Activities And Statements Reflect That Manukyan Made False Representations And Certifications To Obtain The PPP Loan

29. As set forth above, with respect to Manukyan's June 2020 Argo Global, Inc. PPP loan application, Manukyan certified that Argo Global, Inc. "had employees for whom the applicant paid salaries and payroll taxes or paid independent contractors," that "[a]ll SBA loan proceeds will be used only for [Argo Global, Inc.] business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule;" and that "the funds will be used to retain [Argo Global, Inc.] workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments." However, on June 24, 2020, Manukyan engaged in actions that illustrate the falsity of the representations and certifications.

30. On June 24, 2020, Manukyan entered a Glendale BoTW branch and sought to wire $200,000.00 from the Manukyan BoTW 1949 Account to an account in the name of AMPEX which, according to a web search, is a dealer in precious metals such as gold bars. Persons engaged in illegal activity often attempt to launder substantial sums of money by purchasing precious metals because precious metals are untraceable. When the BoTW bank teller asked Manukyan the reason for the large wire, Manukyan replied that his accountant had instructed Manukyan to make the wire.

31. About ten minutes after Manukyan completed the wire transfer documents for AMPEX, Manukyan returned to the Glendale BoTW branch, and stated that he wanted to cancel the wire to AMPEX and instead wished to wire the funds to Manukyan's Los Angeles Financial Credit personal savings account (i.e., the Manukyan LAFCU 7320 Account). However, Manukyan did not have the account number for the Los Angeles Federal Credit Union account with him, so the wire was not completed.

32. Approximately one hour later, Manukyan entered a Burbank BoTW branch, i.e., a different BoTW branch, in order to wire the $200,000.00 from the Manukyan BoTW 1949 Account to the Manukyan LAFCU 7320 Account. While the wire transfer was initially completed on June 24, 2020, the next day, on June 25, 2020, the $200,000.00 was returned to the Manukyan BoTW 1949 Account. In light of the suspicious activity in the Manukyan BoTW 1949 Account, BoTW froze the account and contacted law enforcement officers for assistance.

33. On June 26, 2020, a BoTW investigator contacted Manukyan and asked Manukyan to explain the nature of the funds and the reason for the wires. Manukyan stated that he was just following his accountant's instructions to move $200,000.00 to Manukyan's savings account. In addition, Manukyan stated that he urgently needed the funds because he was starting a new limousine business, needed to place vehicle orders on Amazon and already had customers lined up. Also, Manukyan stated that he would be forced to terminate his business with BoTW if BoTW maintained the freeze on his account.

34. Amazon's website does not reflect that persons can sell vehicles using the company's website. Instead, Amazon's website permits the public to research vehicle prices, shop for vehicle accessories and upload vehicle reviews. In addition, with respect to Manukyan's threat to terminate his business relationship with BoTW, the government notes that persons engaged in fraudulent activity often use high-pressure tactics, such as Manukyan's threat, in an effort to influence others to quickly provide money to the person engaged in the fraud.

Manukyan's California Employment Development Department Fraud Scheme

35. While law enforcement officers were conducting surveillance on Manukyan with respect to their investigation into his PPP fraud scheme, officers learned that Manukyan was also involved in a fraud scheme whereby Manukyan used California Employment Development Department ("EDD") benefit/debit cards, which are cards issued by the EDD to persons who qualify for the receipt of unemployment benefits and allow the qualified card user to use the cards to withdraw their unemployment benefits in cash. Manukyan's fraud scheme involved his applying for unemployment using the name of another person, obtaining EDD benefit/debit cards, and taking those cards to ATMs at which Manukyan would withdraw unemployment benefits in cash. The background of Manukyan's EDD fraud is as follows.

36. At approximately 10:01 a.m., 10:46 a.m., 10:56 a.m. and 11:10 a.m. on July 15, 2020, officers saw Manukyan stop at four different BofA ATMs at four BofA branches located in Van Nuys, North Hills, Northridge and Reseda, California. Based on

a conversation on July 16, 2020 with a BofA investigator, officers learned that, on July 15, 2020, Manukyan had withdrawn at ATMs at each of the four BofA branches approximately $1,000.00 in cash on each of four BofA EDD benefit/debit cards (for a total of approximately $4,000.00) in the name of someone else.[2]

37. In addition, on or about July 17, 2020, officers spoke with an EDD Criminal Investigator, who told officers the following. As a result of a search of unemployment claims relative to EDD benefit/debit cards registered to Manukyan's Panorama City and Glendale, California residence addresses, it was determined that there were an additional five BofA EDD benefit/debit cards for which unemployment benefits had been paid.[3]

38. These EDD benefit/debit cards had fraud indicators due to their similarities, including that unemployment applications for two of the cards both reflected that the alleged employee seeking unemployment benefits had been employed for one day before being laid off due to the coronavirus. In addition, unemployment applications for three of the cards provided that

---

[2] The four EDD benefit/debit cards were registered to Manukyan's Panorama City or Glendale, California residence addresses, contained the last four digits ending in (i) 5189 and was held in the name of A.I.; (ii) 0243 and was held in the name of E.R.; (iii) 6997 and was held in the name of J.T.; and (iv) 1691 and was held in the name of A.K.

[3] The five EDD benefit/debit cards were registered to Manukyan's Panorama City or Glendale, California residence addresses, contained the last four digits ending in (i) 5737 and was held in the name of D.M.; (ii) 5437 and was held in the name of D.M.; (iii) 6426 and was held in the name of T.M.; (iv) 9500 and was held in the name of Y.V.; and (v) 4285 and was held in the name of O.P.

the unemployment benefit applicant had been a waiter employed with an average schedule of one hour per week, and none of these three applications identified or provided any contact information for the unemployment benefit applicant's former employer or the unemployment benefit applicant.

39. On July 22, 2020, law enforcement officers executed a federal search warrant at Manukyan's Panorama City, California residence, and found in Manukyan's room three additional EDD benefit/debit cards, two of which were in the names of someone other than Manukyan.[4] When officers asked Manukyan about the two cards, Manukyan claimed that he had found them in the streets and had decided to keep them in his room. In addition, Manukyan insisted that he had never used the two cards. However, when officers told Manukyan about officers' July 15, 2020 surveillance when Manukyan had withdrawn cash from ATMs using EDD benefit/debit cards in the name of other persons, Manukyan declined to speak further with officers.

40. Manukyan is a fugitive. On August 9, 2020, officers received information that Manukyan had boarded a flight from Mexico City, Mexico inbound to Paris, France with a final destination of Minsk, Belarus.

FIRST CLAIM FOR RELIEF

41. Plaintiff incorporates the allegations of paragraphs 1-40 above as though fully set forth herein.

/ / /

---

[4] One EDD benefit/debit card was registered to D.M. at Manukyan's Panorama City address, contained the last four digits ending in 5437 and was in the name of D.M. while the other card was registered to a Van Nuys, California address, contained the last four digits ending in 7480 and was in the name of P.F.

42. Based on the above, plaintiff United States of America alleges that the defendants constitute or are derived from proceeds traceable to, or a conspiracy to commit violations of 18 U.S.C. §§ 1343 (wire fraud) and/or 1344 (bank fraud) and the defendant EDD funds also constitutes or is derived from proceeds traceable to, or a conspiracy to commit violations of 18 U.S.C. §§ 1028 (identity theft) and/or 1029 (access device fraud). 18 U.S.C. §§ 1028, 1029, 1343 and 1344 are each a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B). The defendants are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). In addition, to the extent that the defendants are not the actual monies directly traceable to the illegal activity identified herein, plaintiff United States of America alleges that the defendants are identical property found in the same account or place as the property involved in the specified offense, rendering the defendants subject to forfeiture pursuant to 18 U.S.C. § 984.

### SECOND CLAIM FOR RELIEF

43. Plaintiff incorporates the allegations of paragraphs 1-40 above as though fully set forth herein.

44. Based on the above, plaintiff alleges that the defendants constitute property involved in multiple transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(A)(i) or (a)(1)(B)(i), or property traceable to such property, with the specified unlawful activity being a violation of 18 U.S.C. §§ 1028 (as to the defendant EDD funds), 1029 (as to the defendant EDD funds), 1343 (as to the defendants) and/or 1344 (as to the defendants). The defendants

1 are therefore subject to forfeiture pursuant to 18 U.S.C.
2 § 981(a)(1)(A).  In addition, to the extent that the defendants
3 are not the actual monies directly traceable to the illegal
4 activity identified herein, plaintiff United States of America
5 alleges that the defendants are identical property found in the
6 same account or place as the property involved in the specified
7 offense, rendering the defendants subject to forfeiture pursuant
8 to 18 U.S.C. § 984.

### THIRD CLAIM FOR RELIEF

10      45.  Plaintiff incorporates the allegations of paragraphs
11 1-40 above as though fully set forth herein.
12      46.  Based on the above, plaintiff alleges that the
13 defendants constitute property involved in multiple transactions
14 or attempted transactions in violation of 18 U.S.C.
15 § 1957(a), or property traceable to such property, with the
16 specified unlawful activity being a violation of 18 U.S.C.
17 §§ 1028 (as to the defendant EDD funds), 1029 (as to the
18 defendant EDD funds), 1343 (as to the defendants) and/or 1344
19 (as to the defendants).  The defendants are therefore subject to
20 forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).  In addition,
21 to the extent that the defendants are not the actual monies
22 directly traceable to the illegal activity identified herein,
23 plaintiff United States of America alleges that the defendants
24 are identical property found in the same account or place as the
25 property involved in the specified offense, rendering the
26 defendants subject to forfeiture pursuant to 18 U.S.C. § 984.
27 / / /
28 / / /

WHEREFORE, plaintiff United States of America prays:

(a) that due process issue to enforce the forfeiture of the defendants;

(b) that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c) that this Court decree forfeiture of the defendants to the United States of America for disposition according to law; and

(d) for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: August 27, 2020

NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section

/s/ Victor A. Rodgers
VICTOR A. RODGERS
Assistant United States Attorney
Asset Forfeiture Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

VERIFICATION

I, Alfredo Rossi, hereby declare that:

1. I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations.

2. I have read the above Complaint for Forfeiture and know the contents thereof.

3. The information contained in the Complaint is either known to me personally, was furnished to me by official government sources, or was obtained pursuant to subpoena. I am informed and believe that the allegations set out in the Complaint are true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on August 27, 2020 at Los Angeles, California.

*Alfredo Rossi*
Alfredo Rossi